## EMILE GROSSE *v.* THE STATE.

1. ARREST — CONFESSIONS — CASE STATED.— While the defendant was in a bar-room violating a city ordinance, the marshal of the city was notified, and summoned a *posse* and confined the defendant in a neighboring crib. *Held,* that notwithstanding the marshal's testimony that he did not "consider" that he had the defendant under arrest, the arrest was complete, and statements made by the defendant under such circumstances were not admissible as evidence against him.

2. IMPEACHING TESTIMONY — PREDICATE — PRACTICE.— If it be proposed to contradict the testimony of a witness by his deposition taken before an examining court, it is necessary to show him his signature to the deposition, and so much of its contents as involves the statements sought to be impeached. A question which directed the attention of the witness to the "examining trial in this case" sufficiently laid the predicate as to time and place.

3. SAME.— It was not necessary to ask the witness if his deposition was read over to him in the examining court. The fact, however, that it was not read over to him might be elicited as a circumstance tending to account for discrepancies between it and his testimony at the final trial of the case.

4. SAME.— If the deposition itself is to be used for the purpose of contradicting the witness, it must be shown that he subscribed it or put his mark to it. But if the deposition was inadmissible because not signed or not authenticated, it was competent to contradict the witness by oral proof of his conflicting statements in the examining court, if they were of a material nature.

5. PRACTICE — EVIDENCE.— The Code of Procedure, art. 661, expressly provides that evidence necessary to the due administration of justice may be introduced at any time before the argument of the cause is concluded. This provision applies as well to the predicate for the proposed evidence as to the evidence itself.

6. SAME.— In the cross-examination of the prosecuting witness the defense laid no predicate to contradict his testimony by proof of his prior statements conflicting with it, but, after the State had closed its evidence, proposed to recall the witness for that purpose, and then contradict his testimony in chief by his deposition at the examining trial of the cause. *Held,* error to disallow the recall of the witness,— no ill-faith or sharp practice being imputable to the failure to lay the predicate in the course of the cross-examination.

7. SAME — ARGUMENT.— Counsel for the defense promptly objected to the prosecuting counsel, in his closing address to the jury, telling

them in effect that public opinion convicted the defendant of the theft imputed to him. *Held*, that the court below should have sustained the objection, and have restricted the prosecuting counsel to discussion of the evidence.

APPEAL from the District Court of Comal. Tried below before the Hon. THOS. M. PASCHAL.'

The indictment was presented on December 6, 1881, and charged that, on the 1st of the preceding July, the defendant stole from Andreas Wucherer sixty-five gold pieces, current money of the United States, each of the value of twenty dollars. At the trial of the cause the jury found the defendant guilty and assessed his punishment at a term of four years in the penitentiary.

Wucherer, the owner of the stolen money, was first introduced by the State. He testified that the money consisted of sixty-five twenty-dollar gold pieces, current money of the United States of America, worth twenty dollars each, and that they were taken from his valise, which was behind the counter of Henry Ludwig's barroom in the town of New Braunfels, in the county of Comal. Witness had been boarding at Ludwig's about a month, and many other persons boarded there at the same time. The defendant, the witness, and a tinner named Smith slept under an open shed which fronted the yard and stable. A public street led alongside of the yard and shed. Witness had brought the money with him when he came to Ludwig's to board, and previous to July 2, 1881, wore it around him in day-time in a buckskin bag attached to a belt, and when he retired at night it was his regular habit to take it off and put it under his head. Usually he got up about sunrise, and then he would buckle it on him again. The bed of Smith, the tinner, was within a foot or two of witness's, and was occupied by Smith every night during the period in question. There was nothing to prevent persons in the street

or yard from seeing witness buckle the belt around him when he got up, but he usually looked to see that no one was watching him. On the 2d of July, 1881, he took the money from around him in the bar-room, where the defendant was at the time, and, putting it in his valise, placed the valise behind the counter. Defendant said it was not safe to put it there, because the place was so public, and that it would be better to put it in his room, which adjoined both the bar-room and the dining-room. Witness replied that he regarded the money as safer behind the counter of the bar-room than it would be in the defendant's room, in which two other men slept. Witness's valise and money remained behind the counter without his looking after it until the morning of the 6th of July, when Ludwig called him up to know if he had any money in the valise. Witness replied that he had thirteen hundred dollars in gold in it. After putting the money in the valise on the 2d of July, he saw it no more until about noon on the 6th of August, 1881, when August Hampe, the city marshal of New Braunfels, and Adam Seideman, a deputy sheriff, turned over to him all except one of the gold pieces. They had been found by Hampe and F. Wieman, in the presence of Henry Ludwig and his wife, Mrs. M. Ludwig. The day before that on which the money was missed, the witness told defendant that he, witness, would lend the money to Ludwig in a day or so.

On his cross-examination the witness stated that when the money was taken the defendant was barkeeper for Ludwig, but the latter and his wife were frequently behind the bar. So far as the witness knew, Mrs. Ludwig and defendant were on good terms before and after the money was stolen; and witness had never stated to the contrary. About two o'clock in a night some two weeks before the money was found, a shower of rain came up and drove witness and the defendant into the

bar-room, where the witness by chance got hold of the key of defendant's trunk, without the latter's knowledge, and witness, about three o'clock in the night, went to the defendant's room, lighted a candle, and unlocked the defendant's trunk, which witness carefully examined. The missing money was not then in the trunk, and witness returned to the bar-room, put the key where he found it, and went to sleep. All this was done without the defendant's knowledge. Only sixty-four of the sixty-five gold pieces had been recovered by the witness.

The day before the money was found, Henry Ludwig told witness to get a search warrant for defendant's trunk, but witness did not do it. On the morning the money was found, Ludwig called Mr. Hampe, the city marshal, and told him to go into the dining-room, where defendant's trunk then was, and to shake the trunk,— that there appeared to be something heavy in it. Both Ludwig and Hampe shook the trunk, and then Hampe went off and returned, accompanied by Mr. Wieman. About a week previous, the partition between the dining-room and the defendant's room was removed, and both became the dining-room; and the defendant's trunk was left in the room. Witness had told Ludwig, Schoener, and many others that he had this money to lend, but never told anyone where it was. Defendant, however, as already stated, saw witness put it in the valise on the 2nd of July. Defendant knew that witness had the money, and was the only person who learned from witness where it was. Witness was seventy-one years old, and the money stolen was all the money he had.

Henry Ludwig, for the State, testified that the defendant was in his employ as barkeeper at the time Wucherer's money was taken. Witness was keeping a hotel and a bar-room in connection with the hotel. When the money was missed, July 2, 1881, a great many persons were boarding with witness. The dining-room door led into

the street, and was always kept open. Wucherer had been boarding with witness about a month when the money was lost, and at different times had told witness that he, Wucherer, had twelve or thirteen hundred dollars to lend, but had never told witness where the money was kept. Having observed the valise behind the counter, witness asked the defendant whose it was, and the latter replied that it belonged to Wucherer. The morning the money was missing, the defendant called witness about an hour earlier than the former usually got up, and they immediately went into the bar-room. This was about an hour before day. Defendant, when he called witness, said that there was something wrong in the bar-room,— that one window had been broken open, and that the money drawer was on the counter. Witness saw that old man Wucherer's valise was spread open. Some old clothes were on the floor, and there was no money there. Not knowing whether there had been any money in the valise, witness went and asked Wucherer about it. Witness afterwards discovered that his own watch and chain, and five or six dollars in small change, had been taken out of the money drawer, and they were afterwards found in the defendant's trunk. Witness was present when Wucherer's money was found. Witness called in Mr. Hampe, the city marshal, and requested him to shake the trunk, because witness believed the money was in it. Both witness and Hampe shook the trunk, and the latter went off, and in less than an hour returned with the key to it. Hampe unlocked and opened the trunk, and, in the presence of Wieman, and of witness and wife, searched it, and in the upper tray found a buckskin belt, wrapped up. Hampe felt but did not then open the belt. Leaving the trunk in Mrs. Ludwig's room and charge, Hampe went off and about noon came back with a search warrant, which he executed by searching the trunk in the presence of witness and wife, Wieman, and Seideman, a

deputy sheriff. In the trunk were found sixty-four twenty-dollar gold pieces, some silver change, and witness's watch. After Wucherer's money disappeared, the witness noticed that when he and Wucherer talked to each other, the defendant would approach them and listen to what they said. During the day on which the money was missed, the defendant was frequently running to the water-closet, and said he had the diarrhoea.

On his cross-examination, Mr. Ludwig stated that the defendant's monthly employment expired with the 5th of August, and witness had told him he wanted him no longer. He did not stay at witness's that night; but was at the bar-room the next morning between six and seven, and a second time about nine o'clock, when he was under the influence of whisky. His clothes were muddy, and he did not have his watch and chain on him. Mr. Randall (defendant's witness) was also there. This witness Ludwig denied that he had testified before the examining court that it was daylight when the defendant awoke him the morning the money was missed.

August Hampe, for the State, testified that on August 5th, 1881, he then being city marshal of New Braunfels, some one reported to him that the defendant was at Halm's bar-room, drunk and making a disturbance, in violation of a city ordinance. Witness went at once and found defendant lying on the floor of Halm's bar-room, and kicking and striking like a drunken man. With the assistance of two other men, witness carried the defendant into Halm's corn-crib, and fastened the door of the crib so that he could not get out. Counsel for the State asked the witness to tell the jury what the defendant said during the interim between his removal from the bar-room and his confinement in the crib. Counsel for the defense objected, on the ground that the inquiry called for statements made by defendant when he was in arrest. The witness was then interrogated specially upon the inquiry

whether the defendant, during the time in question, was in arrest. The witness testified that he did not consider the defendant under arrest when taken from the bar-room to the crib. Witness took the defendant as he would a friend. "I suspected defendant of having stolen the money, and defendant knew I suspected him. I took charge of the defendant at the bar-room, as aforesaid, in my capacity as city marshal of the city of New Braunfels." The court overruled the defendant's objection, and admitted the proposed statement; and thereupon the witness testified that the defendant, during the interval in question, exclaimed, "Oh! kill me, Hampe; I am lost any how." The defense excepted to the ruling of the court admitting this testimony.

After leaving the defendant in the corn-crib, witness went to Ludwig's, who showed defendant's trunk to witness, shook it and told witness to shake it. Witness shook the trunk and felt some heavy thing knock against the top of the trunk. It was then about nine o'clock, A. M., and witness went at once to Mr. Wieman, and asked him for defendant's trunk key, which, as witness had learned, had been taken by Mr. Wieman from the defendant that morning when the latter was at Wieman's shop, drunk. Witness came back to Ludwig's, accompanied by Wieman, and took the key and unlocked the defendant's trunk in the presence of Wieman, Ludwig and Mrs. Ludwig. The trunk was then in Ludwig's dining-room, and no search warrant had then been obtained. Searching the trunk, witness found in its top tray a buckskin belt, wrapped up, and putting his hand on it, felt in it what he took to be money. Without opening the belt, he took the trunk up to the private room of Ludwig and wife, and told the latter to watch it until he came back. Then the witness, though he had no warrant for defendant, went to the crib where he was fastened up, and with assistance took him to the city calaboose, from which he was subse-

quently taken to jail by a deputy sheriff. Defendant had not been at large since he was taken by the witness from Halm's bar-room. After defendant was put in the calaboose, a search warrant to examine his trunk was obtained, and witness, with Wieman, deputy sheriff Seideman, and Ludwig, went to the room in which the trunk had been left, searched it, and found the money rolled up in a buckskin belt. There were found in the trunk sixty-four twenty-dollar gold pieces, a silver watch, and some small change in silver. By this witness, Hampe, the date of these transactions is given as the 5th of August, 1881, but other witnesses give the 6th as the date.

Mr. Wieman, for the State, testified that about seven or eight o'clock of August 6th, 1881, the defendant, at the hotel, asked witness to lend him a pistol, as he intended to kill Henry Ludwig, Matilda Ludwig, and Andreas Wucherer, because they accused him of the theft of Wucherer's money, and because Mrs. Ludwig was always quarreling with him about it. Witness refused to lend him a pistol, and he remarked that he would buy one. Later in the day witness again saw the defendant at the hotel, who then had a pistol with which he said he would kill the persons already named. About half an hour afterwards the defendant was in witness's shop, drunk and lying on the floor. Witness lifted the defendant up, and laid him under a tree in the yard, and took his watch, chain, money and key, for safe keeping. When witness took defendant's pistol he exclaimed " Oh Wieman! do something to me; I am an unfortunate man." Witness gave defendant's key to Hampe, the city marshal. The rest of the testimony of this witness related to the opening of defendant's trunk, and accorded with Hampe's evidence on that subject.

Mina Schroeder, for the State, testified that she was working at Ludwig's when Wucherer's money was stolen. Defendant left his trunk unlocked for about two weeks

after that event, and after that time it was put in the dining room and placed on a barrel. The morning the money was found in the trunk, defendant, when he left, covered the trunk with a buffalo robe, locked it, and turned its front to the wall. With the testimony of this witness the State closed its evidence.

For the defendant several witnesses testified that he had been in their employ at different times within the preceding two years, and they had found him to be of good character, honest and industrious.

R. Kuykendall, for the defense, stated that from the 9th to the 29th of July, 1881, he occupied the room in which defendant's trunk stood, and noticed that it was usually unlocked.

Oswald Randall, for the defense, testified that, in the evening of August 5th, 1881, at Ludwig's bar-room he told the defendant that there was a great deal of talk going on about his being the party who stole the money. After this the defendant went home with witness and remained that night, and they talked about the Ludwigs and old man Wucherer accusing defendant of the theft of the thirteen hundred dollars. Witness said that if he were in defendant's place he would not stay at Ludwig's when they were talking about him in that way. The next morning the defendant started back early to open the bar-room, and witness, who then lived about three-fourths of a mile from town, told defendant he would bring him over in his buggy. About half past six that morning defendant came over with witness to Ludwig's bar-room, and it was not long before he had a difficulty with Ludwig about the accusation of theft. About seven o'clock, the defendant left Ludwig's, and in about an hour came back there, looking muddy and dirty as if he had been in the gutter, and was intoxicated. He did not then have on his watch, which he was wearing early in the morning. When he came in the witness said to

him, in the presence of several others, that now was a good time to show them that he was not guilty, by opening his trunk and letting them see that the money was not in it. He felt in his pocket for the purpose (as the witness understood his actions) of finding his key to open his trunk. Witness was proceeding to tell what the defendant said about opening his trunk, but the court disallowed it, and the defense excepted.

The defense offered Henry Ludwig's deposition before the examining court, and by it proposed to contradict his testimony at bar respecting the hour at which he was aroused by the defendant, the morning Wucherer's money was missed. The court, however, excluded the deposition, and the defense excepted.

*Guinn & Denman,* for the appellant.

*Horace Chilton,* Assistant Attorney General, for the State.

HURT, J. Grosse, the appellant, was convicted of theft of the money of one Andreas Wucherer. He moved for a new trial, which being overruled, the cause is appealed to this court.

The first bill of exceptions raises the question, Was defendant under arrest when certain remarks were made by him, which were adduced by the State on the trial over defendant's objections? August Hampe, by whom the State proved these remarks, states: "I am now and have been continuously for more than three years city marshal of the city of New Braunfels. . . I was at my brother's store and some one came and told me that the defendant was over at Halm's bar-room, drunk and creating a disturbance. I went over to the bar-room and found defendant lying on the floor, kicking and striking at every one who came near him. It is an offense

against the city ordinance to be drunk and disorderly in a public bar-room. I at once called on several others to assist me. We then took defendant and carried him to Halm's corn crib, and put him in the crib, and barred the door so that he could not get out. I took charge of defendant in my capacity as city marshal. I went over to the bar-room because it was my duty as an officer to attend to such things. I did not consider defendant under arrest when I took him from Halm's bar-room to the corn crib."

Whether this marshal *considered* defendant under arrest or not, he nevertheless was most evidently so. The opinion of this witness, if admissible, certainly cannot control that fact. If to summon a *posse*, and take a person and carry him to and place him in a crib or elsewhere, and bar the doors so that he cannot escape, does not constitute an arrest, we are at a loss to know what physical acts would. The defendant was committing an offense, and while thus engaged was taken by the officer whose duty it was to arrest him; and he (the officer) states that he took charge of defendant in his capacity as city marshal. But, be that as it may, the defendant was in violation of the law, a *posse* was called for by the city marshal, responded, and defendant was taken and confined. The question is not so much the intentions and opinions of the marshal in regard to the matter, but the actual situation of defendant, and he was evidently not only in actual but intentional arrest, and, if in arrest, in the custody of the marshal; and therefore his confessions, statements or declarations were not admissible.

2d Bill: The defendant offered the deposition of a witness taken before the examining court, and properly certified to, by which he proposed to prove contradictory statements by a certain witness. Counsel for the State objected because the proper predicate had not been laid. The predicate was as follows: "Defendant asked the

witness if he had not stated, on his examination in the committing court *in this case*, that it was daylight when defendant awoke witness, the morning the stolen money was missing;" which was answered in the negative. The court sustained the objection, upon the grounds that "witness was not shown his signature nor the written examination, nor asked if it had been read to him in the magistrate's court, nor was his attention called to time or place other than as set out herein."

We are of the opinion that it was necessary to show to witness his signature and that part of the deposition in regard to which it was sought to impeach the witness. Mr. Greenleaf states this to be the rule. "A similar principle prevails in cross-examining a witness as to the contents of a letter or other paper written by him. The counsel will not be permitted to represent, in the statement of a question, the contents of a letter, and to ask the witness whether he wrote a letter to any person with such contents, without having first shown to the witness the letter, and having asked him whether he wrote that letter." 1 Greenl. Ev. § 46. Assuming that defendant desired to introduce the deposition, the above course should have been pursued. The rule specifies letters and other papers written by the witness. We think that by analogy depositions would be included.

It was not necessary that the witness should have been asked if it had been read over to him. We are of the opinion that his attention was sufficiently called to time and place. The object of the rule requiring the predicate is that the witness sought to be impeached should be informed of the transaction or conversation. This is usually done by citing the time and place, and naming those present; but it certainly cannot be doubted that the witness was informed of this matter by the predicate laid in this case. This charge had been inquired into by an examining court. The witness knew whether he had

been a witness or not; if he had, certainly the time, place and presence could not have furnished additional information. If the deposition was not in fact read over to the witness, this could have been shown; not, however, to prevent its introduction, but to be considered in connection with any explanation made by the witness.

· Of course the impeaching party must show that the witness signed the deposition or made his mark thereto. This is necessary when it is attempted to use the deposition. If, however, the deposition has not been signed, or if it has not been properly authenticated, still the witness can be impeached by proving what was sworn by him, and if material and in conflict with his evidence on the final trial, this course would be permissible though the deposition be inadmissible.

The third and fourth bills raise the same question, which is: Has a party the right, the other party having closed its evidence, to recall an opposing witness for the purpose of laying the predicate to impeach the witness? The court below held in the negative, and gave these reasons: "The defendant had ample opportunity to lay the predicate on cross-examination when the witness was introduced by the State, but when the State closed, and defendant sought to do this, after stating that his object in putting him on the stand was to try to impeach him, I would not permit it." Unless there were some indication of a disposition on the part of counsel for defendant to trifle with the court, or unnecessarily to consume the time of the court, this should have been allowed. Notwithstanding this matter may be in the sound discretion of the court below, the discretion may be abused. With what perfect ease could these indications be shown in the record. This, however, by the way; for we are not left in the dark as to the reason actuating the court in refusing to permit defendant to recall the witnesses.

We cannot concur in the action of the court below

based upon the reasons given. How frequently is it the case that counsel is not aware of the contradiction until after the opposite party has closed. It is no answer to reply that defendant knew. How many litigants know of the necessity of a predicate at all? Again, the most painstaking, cautious and learned counsel often forget to lay the predicate, or the proper predicate. We know that after both sides have actually closed the evidence, they may hesitate and consult before announcing the fact. We will not pursue this subject further than to cite the case of *Treadway* v. *State*, 1 Texas Ct. App. 668. In the Treadway case the reason assigned by the judge was because, if defendant recalled the witness, he would make him his own witness, and that he would not be allowed to impeach his own witness. In the case before us the reason given is that the State had closed, and that defendant had the opportunity of laying the predicate in his cross-examination. This, we think, is directly in conflict with the Code upon this subject. If the due administration of justice requires it, either party has the right to introduce evidence at any time before the argument is concluded; and if they have the right to introduce evidence, certainly they have the right to lay the predicate for its introduction.

We will consider one other matter complained of by the appellant. The eighth bill informs us that the district attorney in the close stated to the jury, over objections of defendant, that "he heard, while out on the street in New Braunfels, a citizen remark that it was a great shame that the *defendant* should have taken the money of the old man Wucherer, near seventy-one years old, and all the money he had in the world." The court overruled the defendant's objections and allowed the district attorney to repeat these remarks, and gives this explanation: " The district attorney used the remarks by way of argument, and the facts were testified to besides,— that is,

that Wucherer was seventy-one years old, and it was all the money he had." We cannot conceive how these remarks could be termed (as applicable to a legal trial) argument. An argument, it is true, is "a reason offered in proof, to induce belief, or convince the mind." A person on the street believed that defendant stole an old man's money, and thinks it a shame; therefore the minds of the jurors should be convinced that defendant is guilty.

If this is legitimate the crowd, which in some cases is a mob, should be consulted, and its decision reported to the jury, and the verdict should be rendered by this outside tribunal, if approaching unanimity, and be substituted for that of the jury. Who would be willing thus to be tried, or who would be willing for a jury to pass upon his guilt, their minds being first filled with the opinions of the streets, frequently manufactured by ignorance or prejudice, if not malice? This would not be a trial but a seriously solemn mockery of the same. A citizen is vouchsafed a fair and impartial trial by a jury of twelve men. Rules are given by which the jurors are tested, under oath, touching their relationship, prejudices, and opinions. When an impartial jury is impaneled, the guilt of the accused is tried under the law and evidence. The evidence consists of facts sworn to by witnesses. The witnesses must confront the accused. Hearsay evidence (facts) is not admissible; neither, *a fortiori*, are street opinions. The fact that there was evidence that the prosecutor was aged, and that he lost all of his money, had no connection with, nor could it justify, the allusion to outside opinions. The court should have promptly stopped the district attorney, and informed the jury that they should disregard these opinions, and try the defendant by the facts sworn to by the witnesses.

The refused charges, we think, are obnoxious to the objection of being upon the weight of evidence. They present a case much more restricted than that indicated

by the evidence. *All* the facts constitute the case, and not a part.

For the errors above noted, the judgment is reversed and the cause remanded.

*Reversed and remanded.*